## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re:<br><br>COMMERCIAL CAPITAL, INC.,<br>a Colorado Corporation,<br>EIN 20-2508479,<br><br>Debtor. | Case No. 09-17238-MER<br>Chapter 11 |
| In re:<br><br>CCI FUNDING I, LLC<br>a Delaware Limited Liability Company<br><br>EIN  20-5982391<br><br>Debtor. | Case Number 09-17437-MER<br>Chapter 11<br><br>**JOINTLY ADMINISTERED UNDER<br>CASE NO. 09-17238 MER** |

### MOTION TO APPROVE INTERIM ORDER (I) AUTHORIZING THE DEBTORS (A) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) AND 364(d)(1) AND (B) TO RETURN CERTAIN CASH COLLATERAL TO WESTLB AG, NEW YORK BRANCH, AND (II) GRANTING ADEQUATE PROTECTION TO WESTLB AG, NEW YORK BRANCH PURSUANT TO 11 U.S.C. §§361, 362, 363 AND 364 AND (III) SCHEDULING FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001

Debtors Commercial Capital, Inc. ("CCI") and CCI Funding I, LLC ("CCIF"), by and through the undersigned and pursuant to Fed. R. Bankr. P. 4001(c), hereby request that this Court approve (1) the Debtors' execution of the Debtor-In-Possession Credit Agreement attached hereto as Exhibit A; (2) the return of certain cash collateral to WestLB AG, New York Branch ("WestLB") as described below, and (3) the provision of adequate protection to WestLB as described below. In support of its motion, CCIF states as follows:

### BACKGROUND

1.      CCI filed its voluntary Chapter 11 bankruptcy petition on April 22, 2009. CCIF filed its voluntary Chapter 11 bankruptcy petition on April 24, 2009.

2.      The Debtors continue in possession of their properties and in management of their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

915690.2

3.     Prior to filing their respective bankruptcy petitions, CCI and CCIF were engaged in the commercial real estate lending business, including construction lending. Financing for CCIF's real estate lending business was provided by WestLB AG, New York Branch ("WestLB") pursuant to a Credit and Security Agreement dated as of January 5, 2007 (the "Credit Agreement") between WestLB as lender and agent, CCIF as borrower and Wells Fargo Bank, National Association ("Wells Fargo") as custodian.

4.     CCI originated certain construction mortgage loans (the "Mortgage Loans") and sold the funded portions of such Mortgage Loans to CCIF pursuant to a purchase and sale agreement. The Mortgage Loans acquired by CCIF, together with other property, were pledged by CCIF as collateral for its obligations to WestLB under the Credit Agreement. CCI retained the responsibility for servicing the Mortgage Loans and administering related real estate owned properties pursuant to a servicing agreement dated as of January 5, 2007 (the "Original Servicing Agreement") between CCI as servicer, CCIF as owner, Wells Fargo as back-up servicer, and WestLB as agent.

5.     On or about June 1, 2009, this Court entered its Agreed Order Directing Debtors to Provide WestLB AG with Adequate Protection with Respect to (I) Properties Subject to Foreclosure Proceedings; (II) Properties which the Debtors Have Taken Possession of Through Foreclosure, Deed In Lieu of Foreclosure or Other Means; and (III) Use of WestLB AG's Cash Collateral (the "Adequate Protection Order"). The Adequate Protection Order provided, among other things, that effective June 1, 2009, CCI would have no further rights and obligations pursuant to the Original Servicing Agreement, and that TriMont Real Estate Advisors, Inc. ("TriMont") is authorized to assume the duties of successor servicer for the Mortgage Loans pursuant to the terms of that certain servicer appointment agreement or such other or further agreements as WestLB and TriMont deem necessary or appropriate.

6.     Many of the Mortgage Loans are in default. In some cases, the Debtors have foreclosed on related mortgaged properties or have taken deeds in lieu of foreclosure, and hold the subject real properties (the "REO Properties") acquired through foreclosure or deed-in-lieu.

7.     Pursuant to the Credit Agreement, WestLB's lien encumbers the Mortgage Loans, the REO Properties held by CCI and CCIF, all related collateral (including payments received, guaranties, insurance policies, bank accounts containing collections and proceeds of the Mortgage Loans and REO Properties, and similar assets) and the proceeds of such collateral (collectively, the "Collateral").

8.     The Debtors have no unencumbered cash. In order to preserve the value of the Collateral, the Debtors require access to cash to pay certain expenses, including (a) servicing fees and expenses, (b) custodial fees and expenses, (c) legal fees and expenses incurred in connection with the administration of their estates and the prosecution of foreclosures and other remedial actions, and (d) certain other expenses related to preserving the value of the Collateral, including possible additional advances to borrowers under the Mortgage Loans and expenses of maintaining and preserving the REO Properties.

9.     In order to acquire the cash to fund the foregoing expenses, the Debtors have negotiated a Debtor-In-Possession Credit Agreement with WestLB, a copy of which is attached hereto as Exhibit A (the "DIP Credit Agreement").

10.     The Debtors believe and assert that the DIP Credit Agreement is the only available source of debtor in possession financing in the bankruptcy cases of the Debtors, and that the Debtors would be unable to obtain debtor in possession financing on the same or more favorable terms from any other party.

11.     Certain  terms and provisions of the DlP Credit Agreement are described below.

## DIP CREDIT AGREEMENT TERMS

12.     The interest rate on the proposed debtor-in-possession loans (the "DIP Loans") is, prior to the occurrence and continuance of an event of default, the sum of (a) the greater of two percent (2.00%) and the one-month London Interbank Offer Rate, plus (b) six percent (6.00%). Under certain circumstances, the interest rate on DIP Loans may be converted to WestLB's "Base Rate" plus five percent (5.00%).  The interest rate on the proposed debtor-in-possession loans (the "DIP Loans") would be, following the occurrence and during the continuance of an event of default, two percent (2.00%) greater than the foregoing interest rate.   DIP Credit Agreement at §§2.04, 2.08.

13.     Interest payments on the DIP Loans may be deferred until maturity, and any accrued and unpaid interest will be compounded monthly.  DIP Credit Agreement at §2.04(a). Any other amounts due and owing under the Credit Agreement, including reimbursable expenses and indemnities, may also be deferred until maturity, and interest on such amounts will be compounded monthly.  DIP Credit Agreement at §§2.04(a), 7.04(c).

14.     The maturity of the DIP Loans is six (6) months after the entry of the proposed Interim Order (I) Authorizing the Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) and (B) to Return Certain Cash Collateral to WestLB AG, New York Branch, and (II) Granting Adequate Protection to WestLB AG, New York Branch Pursuant to 11 U.S.C. §§361, 362, 363 and 364 (the "Proposed Order").  DIP Credit Agreement at §2.03(b); Proposed Order at ¶17(a).

15.     CCIF shall pay WestLB a facility fee equal to one percent (1%) of the DIP Loans actually funded.  DIP Credit Agreement at §2.05.  The facility fee is payable at maturity.  *Id.*

16.     Events of default are listed in Section 6.01 of the DIP Credit Agreement.

17.     The DIP Loans are to be secured by:

           (a)     a super-priority administrative expense claim pursuant to 11 U.S.C. §364(c)(1);

        (b)     a first-priority lien on all unencumbered pre- and post-petition property pursuant to 11 U.S.C. §364(c)(2), including avoidance actions ;

        (c)     a lien on all encumbered post-petition property (except property which is encumbered by WestLB's lien as prepetition secured creditor), junior only to valid prepetition liens, pursuant to 11 U.S.C. §364(c)(3); and

        (d)     a first-priority priming lien on all encumbered pre- and post-petition property (including property encumbered by WestLB's lien as prepetition secured creditor), subject only to the Carve-Out, pursuant to 11 U.S.C. §364(d)(1).

DIP Credit Agreement at §2.11; Proposed Order at ¶¶7, 8 and 10.

18.    As adequate protection for its secured position, the Proposed Order grants the following to WestLB as prepetition secured creditor:

        (a)     a replacement security interest in all prepetition property and an additional security interest in all post-petition property;

        (b)     a super-priority claim under 11 U.S.C. §507(b);

        (c)     interest on the prepetition loans at the default rate under the prepetition loan documents; and

        (d)     the right to withdraw any cash collateral on deposit in the Collection Account, the Reserve Account and the Project Disbursement Account (as such terms are defined in the prepetition Credit Agreement between CCIF and WestLB).

Proposed Order at ¶¶6, 12.

19.    The maximum loan amount is twenty million dollars ($20,000,000.00), plus all "Deferred Interest Payments," plus certain "Additional Deferred Amounts." DIP Credit Agreement at §§1.01 (definition of "Maximum Loan Amount"); 2.04(a), 7.04(c).

20.    The borrowing conditions of each DIP Loan are set forth in Section 3.01 of the DIP Credit Agreement.

21.    The DIP Loans may be used to fund:

        (a)     servicing fees and out-of-pocket expenses of TriMont as servicer;

        (b)     custodial fees of Wells Fargo Bank, N.A. as Custodian;

        (c)     subsequent advances to borrowers under the Mortgage Loans, in WestLB's sole discretion as DIP Lender;

       (d)     advances to preserve and maintain the properties (the "Mortgaged Properties") which secure the Mortgage Loans, and/or the REO Properties, in WestLB's sole discretion as DIP Lender;

       (e)     non-legal expenses incurred in connection with the foreclosure or other realization upon certain Mortgaged Properties, in WestLB's sole discretion as DIP Lender;

       (f)     legal fees of the Debtors' counsel incurred in connection with the orderly administration of the Debtors' bankruptcy cases; and

       (g)     legal fees of the Debtors' in connection with the foreclosure upon Mortgaged Properties and other realization upon the Collateral (including without limitation deeds in lieu of foreclosure, sales of Mortgage Loans and payoffs of Mortgage Loans).

Proposed Order at ¶4.

22.    The right to recover expenses of administration of the Debtors' cases from WestLB's pre- or post-petition collateral under section 506(c) has been waived, unless WestLB consents to such recovery. Proposed Order at ¶19. In this case, the Debtors have no cash of their own. Any funds with which the Debtors will pay the expenses of preserving or disposing of Collateral will be advanced by WestLB as DIP Lender. WestLB as DIP Lender will receive liens on the Collateral, together with any post-petition collateral of the Debtors, to secure such advances. Under those circumstances, the interest of WestLB as prepetition lender will, in effect, already be impacted by the DIP Loans which fund the expenses of preserving or disposing of Collateral.

23.    CCIF acknowledges that its prepetition debt to WestLB is a legal, valid and binding obligation, provided that the Debtors and WestLB reserve their respective rights, remedies and claims arising in respect of the prepetition indebtedness. Proposed Order at Recital D, ¶26.

24.    If no adversary proceeding (a) challenging the validity, enforceability, allowability, priority or extent of WestLB's prepetition loan, or (b) otherwise asserting claims against WestLB as prepetition lender on behalf of the Debtors estates, is filed within sixty (60) days of the entry of a final order approving the DIP Credit Agreement, the prepetition indebtedness shall constitute an allowed secured claim, and any claims against WestLB as prepetition secured party shall be deemed waived and released. Proposed Order at 26.

25.    No DIP Loan proceeds, proceeds of prepetition or post-petition collateral, or the Carve-Out may be used to (a) challenge the prepetition debt to WestLB or the liens and claims granted under the Proposed Order, (b) assert claims or defenses against WestLB as prepetition lender or DIP Lender, (c) prevent, hinder or delay WestLB's remedies as pre-petition lender or

DIP Lender, (d) seek to modify WestLB's rights as pre-petition lender or DIP Lender or (e) pay any prepetition debts unless ordered by the Court.  Proposed Order at 27.

26.     The Debtors believe and assert that the entry of the Proposed Order is in the best interests of the estate and its creditors, and is necessary for the successful administration of the Debtors' estates.

WHEREFORE, for the reasons set forth above, the Debtors respectfully request that this Court enter the Proposed Order.

DATED:  August 28, 2009

Respectfully submitted,

OTTEN JOHNSON ROBINSON NEFF & RAGONETTI, P.C.

By: /s/ David T. Brennan
    Darrell G. Waas, #10003
    David T. Brennan, #15915
    Bill E. Kyriagis, #39112
    950 17th Street, Suite 1600
    Denver, Colorado  80202
    Telephone:  (303) 825-8400
    Facsimile:  (303) 825-8625
    waas@ottenjohnson.com
    dbrennan@ottenjohnson.com
    bkyriagis@ottenjohnson.com

## CERTIFICATE OF SERVICE

I hereby certify that I have mailed on this 28th day of August, 2009, a true and correct copy of the foregoing MOTION TO APPROVE INTERIM ORDER (I) AUTHORIZING THE DEBTORS (A) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) AND 364(d)(1) AND (B) TO RETURN CERTAIN CASH COLLATERAL TO WESTLB AG, NEW YORK BRANCH, AND (II) GRANTING ADEQUATE PROTECTION TO WESTLB AG, NEW YORK BRANCH PURSUANT TO 11 U.S.C. §§361, 362, 363 AND 364 AND (III) SCHEDULING FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001 by placing the same in the United States Mail, postage prepaid, addressed to:

Commercial Capital, Inc.
Attn: Matt Witt
P.O. Box 630130
Littleton, Colorado 80163

Joel Laufer, Esq.
Robert Padjen, Esq.
Laufer and Padjen LLC
5290 DTC Parkway, Suite 150
Englewood, Colorado 80111

CCI Funding I, LLC
Attn: Matt Witt
P.O. Box 630130
Littleton, Colorado 80163

Jeffrey A. Weinman, Esq.
William A. Richey, Esq.
Weinman & Associates, PC
730 17th Street, Suite 240
Denver, Colorado 80202-3506

Darrell G. Waas
David T. Brennan
Otten Johnson Robinson Neff + Ragonetti PC
950 – 17th Street, Suite 1600
Denver, Colorado 80202

Alan K. Motes, Esq.
Office of the United States Trustee
999 18th Street, Suite 1551
Denver, Colorado 80202-2415

Jessica M. Davidson, Esq.
Bloom Murr & Accomazzo, P.C.
410 17th Street, Suite 2400
Denver, Colorado 80202

Stephen J. Gillette
Hunter Wise Financial Group, LLC
6506 S. Killarney Court
Aurora, Colorado 80016

Karl Koch
17200 West Colfax LLC
P.O. Box 9550
Breckenridge, Colorado 80424

Duane A. Duffy
4550 Tule Lake Drive
Littleton, Colorado 80123

Michael E. Haws
14385 Braun Road
Golden, Colorado 80401

Denis L. Rose
14695 West 48th Avenue
Golden, Colorado 80403

WestLB AG, New York Branch
1211 Avenue of the Americas
New York, New York  10036-8701

Lester M. Kirschenbaum, Esq.
Mark F. Liscio, Esq.
Ana M. Alfonso, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, New York  10022

Christopher L. Richardson, Esq.
Davis, Graham & Stubbs LLP
1550 17th Street, Suite 500
Denver, Colorado  80202

Palm Real Estate Ventures LLC
700 17th Street, Suite 2400
Denver, Colorado  80202-3521

Steven E. Abelman, Esq.
Brownstein Hyatt Farber Schreck LLP
410 17th Street, Suite 2200
Denver, Colorado  80202-4432

IndyMac Bank
P.O. Box 78826
Phoenix, Arizona  85062

Michael Haws
14573 E. Mississippi Avenue
Aurora, Colorado  80012

Mutual of Omaha
9125 Commerce Center Circle
Littleton, Colorado  80129

National City
P.O. Box 85617
Louisville, Kentucky  40285

Vinny Sikka
14573 East Mississippi Avenue
Aurora, Colorado  80012

Wells Fargo
P.O. Box 10335
Des Moines, Iowa  50306

Douglas W. Brown, Esq.
Erick S. Arriola, Esq.
Brown, Berardini & Dunning, P.C.
2000 South Colorado Boulevard
Tower Two, Suite 700
Denver, Colorado  80222

Elizabeth Weller, Esq.
Linebarger Goggan Blair & Sampson, LLP
2323 Bryan Street, Suite 1600
Dallas, Texas  75201

William D. Nelsch, Esq.
1490 Lafayette Street, Suite 407
Denver, Colorado  80218

George S. Rosenberg, Esq.
Arapahoe County Attorney
5334 South Prince Street
Littleton, Colorado  80166

James T. Burghardt, Esq.
Moye White LLP
1400 16th Street, 6th Floor
Denver, Colorado  80202-1473

Eric B. Liebman, Esq.
Moye White LLP
1400 16th Street, 6th Floor
Denver, Colorado  80202-1473

Thomas E. Merrigan, Esq.
Berg Hill Greenleaf & Ruscitti, LLP
1712 Pearl Street
Boulder, Colorado  80302

Tom McNamara, Esq.
Davis, Graham & Stubbs, LLP
1550 17th Street, Suite 500
Denver, Colorado  80202

Christopher B. Mosley, Esq.
City of Fort Worth
1000 Throckmorton Street
Fort Worth, Texas  76102

Scott Havn, Esq.
Arnold & Arnold, LLP
7691 Shaffer Parkway, Suite A
Littleton, Colorado  80127

Steve Schefstad
Southern Title Insurance Corp.
3700 Mansell Road, Suite 220
Alpharetta, Georgia  30022

Arthur Lindquist-Kleissler
Lindquist-Kleissler & Company LLC
950 S. Cherry Street, Suite 710
Denver, Colorado  80246

17200 West Colfax, LLC
PO Box 542
Wheat Ridge, Colorado  80034-0542

Hotel Gold Crown Centennial LLC
6460 S. Quebec Street
Centennial, Colorado  80111-4628

Linda Vista of Lakeway, LLC
9211 Waterford Centre Blvd., Suite 200
Austin, Texas  78758-7667

220 Casteel Ridge, LLC
PO Box 1371
Vail, Colorado  81658-1371

Morgan Oliveros Parks, LLC
2210 Malahini Drive
Lake Havasu City, Arizona  86404-1904

Natomas Urban Development, LLC
1300 National Drive, Suite 150
Sacramento, California  95834-1991

Craig Solomon Ganz, Esq.
Greenberg Traurig, LLP
2375 E. Camelback Road, Suite 700
Phoenix, Arizona  85016

Caroline C. Fuller, Esq.
Fairfield and Woods, P.C.
1700 Lincoln Street, Suite 2400
Denver, Colorado  80203-4524

Suzanne E. Rauch, Esq.
Moye White LLP
1400 – 16th Street, 6th Floor
Denver, Colorado  80202

Christian D. Aggeler
Karsh Fulton Gabler & Joseph PC
950 S. Cherry Street, Suite 710
Denver, Colorado  80246

Red River Hotels I, LLC
6841 S. Yosemite St., Suite 110
Aurora, Colorado  80012

Gateway Village, LLC
6841 S. Yosemite St., Suite 110
Centennial, Colorado  80112-1410

VLC Acquisition Group, LLC
7703 N. Lamar Blvd., Suite 510
Austin, Texas  78752-1055

DT Land Development, LLC
4509 Alameda Blvd. NE, Suite B
Albuquerque, New Mexico  87113-1705

Foundations Enterprise Group, LLC
1701 West Thomas Road, Suite 201
Phoenix, Arizona  85015

RM LLC
6460 South Quebec Street
Centennial, Colorado  80111-1904

BM LLC
6460 South Quebec Street
Centennial, Colorado  80111-4628

Upper Blue River Developments, LLC
6116 McKinley Avenue
Des Moines, Iowa  50321-1655

Blake J. Allen
15 Geneva Trl
Manitou Springs, Colorado  80829-1723

Elk Run Plaza, LLC
30360 Beaver Creek Ln
Evergreen, Colorado  80439-9562

G&G/Peninsula LP
3101 Welton Cliff Dr.
Cedar Park, Texas  78613-4345

The Shores, LLC
Orchard Mesa Estates Il, LP
1901 56th Avenue, Suite 200
Greeley, Colorado  80634-2950

/s/ Karen Dunahay
Karen Dunahay

11

EXHIBIT A
Debtor-In-Possession Credit Agreement


(See attached.)

915690.2

KS DRAFT 8/28/09

**$20,000,000**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**between**

**CCI FUNDING I, LLC**

**a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code**

**<u>as Borrower</u>**

**and**

**WESTLB AG, NEW YORK BRANCH.**

**<u>as Lender</u>**

**Dated as of August ___, 2009**

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of August __, 2009 (this "Agreement"), between CCI FUNDING I, LLC ("CCIF"), a Delaware limited liability company and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, as the borrower (in such capacity, the "Borrower") and WESTLB AG, NEW YORK BRANCH ("WestLB"), a German banking corporation acting through its New York Branch, as the lender (in such capacity, the "Lender").  Unless otherwise defined herein or the context clearly requires otherwise, capitalized terms used in this Agreement shall have the meanings given such terms in Article I.

## PRELIMINARY STATEMENTS

The Borrower has filed a voluntary petition with the Bankruptcy Court commencing a case under Chapter 11 of the Bankruptcy Code and the Borrower has continued in the possession of its assets and in the management of its business pursuant to Section 1107 and 1108 of the Bankruptcy Code.

Subject to the provisions of the Bankruptcy Code and the terms of this Agreement, the Borrower has applied to the Lender for a multiple draw term loan, in an aggregate principal amount not to exceed $20,000,000, for the purposes set forth in the Orders, including, in general, to (i) fund certain additional advances necessary for the purpose of completing construction on certain Mortgaged Properties, (ii) preserve and maintain the Mortgaged Properties and REO Properties on an as needed basis, (iii) fund certain agreed upon expenses in connection with the foreclosure and realization upon certain Mortgaged Properties, (iv) pay fees due and owing to the Servicer and the Custodian; and (v) fund certain other expenses and fees agreed to by the Lender.

To assure repayment of the Obligations, the Borrower shall provide to the Lender, pursuant to this Agreement and the Orders, the following (each as more fully described in this Agreement):

(i)	an allowed administrative expense claim in the case pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over any and all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code; and

(ii)	a perfected Lien on the Collateral as provided, and with the priorities set forth in section 364 of the Bankruptcy Code and in Section 2.11;

All of the claims and the Liens granted to the Lender pursuant to the Loan Documents and the Orders shall be subject to the Carve-Out to the extent provided in Section 2.11 and the Orders.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained in this Agreement, the Borrower and the Lender hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01    <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Additional Deferred Amounts" has the meaning specified in <u>Section 7.04(c)</u>.

"Affected Party" has the meaning specified in <u>Section 2.07</u>.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with such Person or is a director or officer of such Person.  For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning specified in the preamble hereto.

"Availability Period" means the period beginning with the date on which the Interim Order is entered by the Bankruptcy Court and ending on the Termination Date.

"Average Loan Amount" means, with respect to an Interest Accrual Period, the number obtained by dividing (i) the sum of the Loan Amounts outstanding as of 5 p.m. on each day during the related Interest Accrual Period by (ii) the number of calendar days in such Interest Accrual Period.

"Bankruptcy" means the Borrower seeking an order for relief under chapter 11 of the Bankruptcy Code on the Petition Date.

"Bankruptcy Causes of Action" shall mean actions for preferences, fraudulent conveyances and other avoidance power claims and any recoveries under sections 506(c), 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Colorado or any other court having jurisdiction over the Case from time to time.

"Base Rate" means, for any day, a rate of interest per annum equal the greater of (i) the rate per annum established by the Lender from time to time as its reference rate (which the Borrower acknowledges is not necessarily the Lender's lowest rate) for short term commercial loans in dollars to domestic corporate borrowers, as determined by the Lender on a daily basis (such rate, the "Prime Rate") and (ii) the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to

the next 1/100 of 1%) of the quotations for such day for such transactions received by the Lender from three Federal funds brokers of recognized standing selected by it (the "Federal Funds Effective Rate") in effect on such day plus 1%. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"Base Rate Loan" means a Loan for which the applicable rate of interest is based upon the Base Rate.

"Borrower" has the meaning specified in the preamble hereto.

"Budget" means a budget, attached as an exhibit to the Orders, for the period commencing on (or prior to) the date hereof through and including the Maturity Date, prepared by the Servicer in consultation with the Borrower and approved in writing by the Lender prior to the approval of this Agreement by the Bankruptcy Court, showing the anticipated usage of the proceeds of the Loans to be made hereunder during such period, together with such updates or changes as shall thereafter be prepared by the Servicer in consultation with the Borrower and be approved in writing by the Lender.

"Business Day" means a day of the year on which banks are not required or authorized by law to close in New York City.

"Carve-Out" means the Carve-Out as defined in the Motion.

"Cases" means the Chapter 11 cases of the Borrower and the Guarantor pending in the Bankruptcy Court.

"Closing Date" means _____, 2009.

"Collateral" means the Prepetition Collateral and the Postpetition Collateral.

"Collateral Documents" means the Prepetition Credit Agreement, the Security Agreement and any other agreement evidencing or perfecting a Lien in favor of the Lender and/or the Prepetition Secured Party.

"Collection Account" has the meaning specified in the Prepetition Credit Agreement.

"Confidential Information" means information that the Borrower furnishes to the Lender on a confidential basis, but does not include any information that (a) is or becomes generally available to the public other than as a result of a breach by the Lender of its obligations under this Agreement, (b) is or becomes available to the Lender from a source other than the Borrower that is not, to the actual knowledge of the Lender, acting in violation of a confidentiality agreement with the Borrower or (c) was available to the Lender on a non-confidential basis prior to the disclosure to the Lender.

"Confirmation Order" means an order of the Bankruptcy Court confirming a Plan of Reorganization.

"Custodial Agreement" has the meaning specified in the Prepetition Credit Agreement.

"Consummation Date" means the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a Plan of Reorganization and which for purposes of this Agreement shall be no later than the date that all of the conditions precedent to the effectiveness of such Plan of Reorganization have been satisfied or waived.

"Custodian" means Wells Fargo Bank, National Association or any substitute Custodian appointed by WestLB as agent pursuant to the Custodial Agreement.

"Default" means any Event of Default or any event that would constitute an Event of Default but for the giving of notice or elapse of time or both.

"Default Rate" means, a per annum rate equal to the sum of (i) the greater of (x) the LIBO Rate and (y) two percent (2.00%), and (ii) eight percent (8.0%).

"Deferred Interest Payments" has the meaning specified in Section 2.04(a).

"Event of Default" has the meaning specified in Section 6.01.

"Existing Liabilities" means all of the Liabilities of the Borrower at the time the Borrower filed for bankruptcy.

"Final Order" means an order of the Bankruptcy Court entered in the Case after a final hearing under Bankruptcy Rule 4001(c)(2), in form and substance satisfactory to the Lender, granting final approval of the Loan Documents and the Transactions.

"Governmental Authority" means any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality or any court, in each case whether in the United States or a foreign jurisdiction.

"Guarantee" means a guarantee agreement executed by the Guarantor in favor of the Lender pursuant to which the Guarantor unconditionally guarantees the obligations of the Borrower under this Agreement, in substantially the form attached as Exhibit A hereto, or in such other form as is approved by the Lender.

"Guarantor" means Commercial Capital, Inc.

"Indemnified Costs" has the meaning specified in Section 7.04(a).

"Indemnified Party" has the meaning specified in Section 7.04(a).

"Interest Accrual Period" means, for any Interest Payment Date, the calendar month prior to the month in which such Interest Payment Date occurs; *provided*, that with respect to the first Interest Payment Date, the Interest Accrual Period shall be the period commencing on the Closing Date and ending on [August 31, 2008); and *provided*, further, that upon the occurrence of, and during the continuance of, an Event of Default, the Interest Accrual Period shall be number of days in or following such calendar month during which interest is not being computed in accordance with Section 2.04(b).

"Interest Payment Date" means the 16th day of each month, or if such day is not a Business Day, the next succeeding Business Day.

"Interest Rate" means (i) prior to the occurrence, or following the discontinuance, of an Event of Default, with respect to each Interest Accrual Period, a per annum rate equal to the sum (A) the greater of (x) the weighted average daily LIBO Rate during such Interest Accrual Period and (y) two percent (2.0%), plus (B) the Margin, or (ii) upon or following the occurrence, and during the continuance, of an Event of Default, the Default Rate.

"Interim Order" means an order of the Bankruptcy Court entered in the Case after an interim hearing under Bankruptcy Rule 4001(c), in form and substance satisfactory to the Lender, granting interim approval of the Loan Documents and the Transactions.

"Lender" has the meaning specified in the preamble hereto.

"Liabilities" means debts, liabilities, obligations and duties of every kind, whether absolute or contingent, monetary or non-monetary, direct or indirect, known or unknown, or matured or unmatured (including, without limitation, guaranties of third parties' debts or obligations).

"LIBO Rate" means the one-month London Interbank Offer Rate as appearing on Bloomberg Screen USLIB0001M (or any successor screen), as determined by the Lender; *provided*, that if such rate is not available on such screen (or on any successor screen), then the Lender shall determine the LIBO Rate by obtaining a quotation therefore from each of three major banks in the London Interbank market and averaging such quotations (rounding upwards, if necessary, to the nearest $1/100^{th}$ of 1%).

"LIBOR Loan" means a Loan for which the applicable rate of interest is based upon the Interest Rate.

"Lien" means any lien, security interest, assignment, hypothecation, deed of trust, mortgage, lease, conditional sale, or other charge or encumbrance of any kind, or any other type of preferential arrangement, including the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property.

"Loan" or "Loans" has the meaning specified in Section 2.01.

"Loan Amounts" means, on any date of determination, the aggregate unpaid principal amount of the sum of the Loans, together with all Deferred Interest Payments and Additional Deferred Amounts, outstanding on such date (including, without limitation, all increases to the principal amount of the Loans outstanding on such date as a result of, and to the extent of all advances, charges, fees, disbursements, costs and expenses incurred or paid by the Lender on or prior to such date, to the extent that such amounts have not been reimbursed to the Lender).

"Loan Documents" means (a) this Agreement, (b) the Security Agreement, (c) the Guarantee, (d) any other agreement, document or instrument executed and delivered by the Borrower or the Guarantor or entered in connection with any of the foregoing agreements or documents or the Transactions, and (e) the Final Order.

"Margin" means six percent (6.0%).

"Material Adverse Effect" means any material adverse effect on (i) the financial condition or operations of the Borrower or the Guarantor (after giving effect to the condition of the Borrower and the Guarantor, as applicable, as of the date hereof), (ii) the ability of the Borrower

or the Guarantor (as applicable) to perform its obligations this Agreement or any other Loan Document, (iii) the Lender's first priority perfected security interest in, or the ability of the Lender to enforce its obligations or realize upon, the Collateral or (iv) the value of the Collateral.

"Maturity Date" means the date occurring six (6) months after the date of the Interim Order.

"Maximum Loan Amount" means, on any date of determination, the sum of (i) Twenty Million ($20,000,000) Dollars, (ii) all Deferred Interest Payments, and (iii) all Additional Deferred Amounts.

"Mortgage Loan" has the meaning specified in the Prepetition Credit Agreement.

"Mortgage File" has the meaning specified in the Prepetition Credit Agreement.

"Mortgaged Property" has the meaning specified in the Prepetition Credit Agreement.

"Mortgagor" has the meaning specified in the Prepetition Credit Agreement.

"Motion" means the motion for approval of the Debtor-in-Possession financing.

"Notice Parties" has the meaning specified in Section 6.01.

"Obligations" means all amounts payable to the Lender or the Prepetition Secured Party pursuant to the Loan Documents (including, without limitation, the outstanding principal amount of the Loans, all interest payable on the Loans and all fees, expenses (including but not limited to reasonable attorneys' fees and expenses), premiums, penalties, fees, indemnifications, advances, liabilities, obligations, debts, contract causes of action, costs and other amounts payable to the Lender or the Prepetition Secured Party pursuant to the Loan Documents, whether direct or indirect, absolute or contingent, including any extensions, modifications, substitutions, amendments and renewals thereof).

"Order" means the Interim Order or the Final Order.

"Permitted Liens" means (a) the Liens securing the Obligations, and (b) Liens securing the Prepetition Indebtedness.

"Person" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"Petition Date" means April 24, 2009.

"Plan of Reorganization" means a Chapter 11 plan acceptable to the Lender.

"Postpetition Collateral" has the meaning specified in the Orders.

"Prepetition Collateral" has the meaning specified in the Orders.

"Prepetition Credit Agreement" means the Credit and Security Agreement, dated as of January 5, 2007, by and among CCIF as borrower, WestLB as agent and lender, and Wells Fargo Bank, National Association as custodian.

"Prepetition Indebtedness" means the indebtedness and all other obligations incurred by CCIF to WestLB pursuant to and in accordance with the Prepetition Credit Agreement.

"Prepetition Secured Party" has the meaning specified in the Orders.

"Reimbursed Expenses" has the meaning specified in Section 7.04(b).

"REO Property" means a Mortgaged Property acquired by foreclosure or deed- in-lieu of foreclosure in connection with a Defaulted Mortgage Loan (as defined in the Prepetition Credit Agreement).

"Requirements of Law" shall mean, with respect to any Person, the charter, articles or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person, and any statute, law, treaty, rule, regulation, order, decree, writ, injunction or determination of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject or otherwise pertaining to any or all of the Transactions.

"Security Agreement" means that certain Debtor-In-Possession Security Agreement, dated as of the date of this Agreement, by the Borrower in favor of the Lender, relating to the Postpetition Collateral.

"Servicer" means TriMont Real Estate Advisors, Inc. or such other Person as shall be identified by the Lender as the servicer under the Servicing Agreement.

"Servicing Agreement" means any servicing agreement governing the servicing of the Mortgage Loans and the administration of the Mortgaged Properties and any REO Properties, executed between the servicer thereunder, the Borrower and the Secured Party, as such agreement may be supplemented, modified, amended or replaced from time to time.

"Super-Priority Claim" means a claim that is an administrative expense claim having priority over any and all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code.

"Termination Date" means the first date of occurrence of a Termination Event.

"Termination Event" has the meaning specified in the Orders.

"Transactions" means the Loans, the granting of Liens on the Collateral to the Lender and the Prepetition Secured Party to secure the Obligations, and all of the other transactions contemplated by the Loan Documents.

SECTION 1.02     Computation of Time Periods; Other Definitional Provisions.    In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."  References in the Loan Documents to any agreement or contract "as amended" shall mean and be a reference to such agreement or contract as amended, supplemented or otherwise modified from time to time.

SECTION 1.03     Rules of Construction.  Unless the context otherwise requires:

(i)     a term has the meaning assigned to it;

(ii)    "or" is not exclusive;

(iii)   words in the singular include the plural, and in the plural include the singular;

(iv)    provisions apply to successive events and transactions;

(v)     the word "including" means including without limitation and the terms "include" or "includes" shall have correlative meanings;

(vi)    "$" means U.S. dollars; and

(vii)   unless otherwise provided, references to Sections, Exhibits and Schedules refer to sections, exhibits and schedules to this Agreement.

## ARTICLE II
## AMOUNTS AND TERMS OF THE LOANS

SECTION 2.01    Loans.  Subject to the terms and conditions of this Agreement and relying upon the representations and warranties set forth in this Agreement, the Lender may, in its sole discretion, make one or more term loans (each a "Loan"; collectively, the "Loans") to the Borrower during the Availability Period, in an aggregate principal amount which, together with all Deferred Interest Payments and Additional Deferred Amounts, shall not exceed the Maximum Loan Amount.  All Loans shall be made subject to and in full compliance with the terms of this Agreement.  Any portion of principal of any Loans repaid may not be reborrowed.

SECTION 2.02    Funding Account; Budget.  (a)  The Lender may, in its sole discretion, make Loans from time to time for the purposes set forth in the Orders, or for any other purpose approved from time to time by the Bankruptcy Court.  Each Loan made pursuant hereto shall, in accordance with the Orders, be either (i) disbursed by the Lender by wire transfer of such funds into a funding account (the "Funding Account") maintained by and in the name of the Servicer, for the benefit of, and in trust for, the Borrower, to effect certain payments in accordance with the Budget, or (ii) directly disbursed by the Lender to effect certain payments in accordance with the Budget.

(b)     Each Loan made by the Lender in accordance with the terms hereof shall be irrevocable and binding on the Borrower.  Each Loan shall be in an amount that would not cause the aggregate outstanding principal amount of the Loans, together with all Deferred Interest Payments and Additional Deferred Amounts, to exceed the Maximum Loan Amount.  No Loan will be made on or following the Termination Date.

(c)     The Servicer shall be authorized under the Servicing Agreement to make withdrawals from the Funding Account and effect payments from time to time for the purposes and in the manner set forth in the Orders, in each case in accordance with the Budget, provided that neither the Lender nor the Servicer shall have any obligation to fund any of the Borrower's or the Guarantor's commitments or make any payments with respect to any Mortgage Loan, Mortgaged Property or REO Property and the Lender may direct the Servicer at any time to cease funding such commitments or making such payments.  No Person other than the Servicer shall be authorized to make disbursements from the Funding Account.

(d)     The Servicing Agreement shall provide that the Servicer prepare updates to the Budget from time to time, at the times and in the manner provided for therein (upon consultation with the Borrower), and the Budget together with such updates, with the prior approval of the Lender, shall become the Budget in effect for the period covered by such Budget.  Until a Budget is updated with the approval of the Lender, the current Budget shall remain in effect for the period covered by such Budget.  The Borrower may submit written requests to the Servicer and the Lender for modifications or updates to the Budget (together with the reasons therefor), however, the Lender shall not be required to approve any such modifications or updates to the Budget.

(e)     Notwithstanding anything to the contrary herein, in the Servicing Agreement, in any Loan Document or in the Budget, the Lender (on its own or through the Servicer) shall be under no obligation to make any Loan or fund or pay any amounts with respect to any Mortgage Loan, Mortgaged Property or REO Property, and the making of all Loans hereunder and the funding or payment of any such amounts, notwithstanding that such amounts are set forth in a Budget, are and shall remain in the sole discretion of the Lender.  Further notwithstanding anything to the contrary herein and notwithstanding that any Loan is funded through disbursement of such amount into the Funding Account, the Lender may direct the Servicer to cease funding or paying any amounts with respect to one or more Mortgage Loans, Mortgaged Properties or REO Properties at any time in its sole discretion.

SECTION 2.03     Note; Repayment; Prepayments.  (a) The Lender may request that the Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall execute and deliver to the Lender a promissory note payable to the order of the Lender in a form approved by the Lender.

(b)     The outstanding balance of each Loan shall mature and be due and payable on the Termination Date.

(c)     The Borrower may, upon at least five (5) Business Days' notice to the Lender, prepay the Obligations, in whole or in part, without any other payment of premium or penalty.  Upon the prepayment of the Obligations, the Borrower shall no longer be entitled to borrow any funds under this Agreement.

SECTION 2.04     Interest.  (a) Except as otherwise provided in Section 2.04(b), each Loan, each Deferred Interest Payment and each Additional Deferred Amount (as each such term is defined below) shall bear and accrue interest with respect to each Interest Accrual Period, computed by the Lender based on the Average Loan Amount relating to such Interest Accrual Period, at a rate per annum equal to the related Interest Rate; *provided* that at the times and under the circumstances described in Section 2.08, each Loan shall bear interest at a rate per annum equal to the Base Rate plus 5.00%.  Interest shall be payable monthly in arrears on each related Interest Payment Date and on the Termination Date.  Any interest accrued on a Loan but not paid on any Interest Payment Date (such unpaid interest, the "Deferred Interest Payments") shall be compounded at the end of each month and shall itself thereafter accrue interest until paid on any Interest Payment Date.  Any interest accrued on Additional Deferred Amounts shall be compounded at the end of each month and shall itself thereafter accrue interest until paid.  Deferred Interest Payments and Additional Deferred Amounts, together with accrued interest thereon, shall be payable on the Termination Date or on demand.

(b)     Upon and following the occurrence, and during the continuance, of an Event of Default, each Loan, each Deferred Interest Payment and each Additional Deferred Amount shall

bear and accrue interest at a rate per annum equal to the Default Rate, compounded monthly, computed by the Lender based on the Default Rate as of each day of computation. In addition, the amount of any interest (including any Deferred Interest Payment), fee, expense or other amount (including any Additional Deferred Amount) payable under the Loan Documents that is not paid when due, shall also bear interest, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and on demand, at a rate per annum equal to the Default Rate, compounded monthly; *provided*, that this sentence shall not apply to any Deferred Interest Payments or Additional Deferred Amounts or accrued interest thereon if and for so long as no Event of Default has occurred and is continuing, during which period such amounts and accrued interest thereon shall bear and accrue interest in accordance with Section 2.04(a).

(c)     Interest payable hereunder shall be calculated based on a year consisting of three hundred sixty (360) days and the actual days elapsed (including the first day but excluding the last day) in the period for which interest is payable. Following the Termination Date or upon the occurrence and during the continuance of an Event of Default, if any interest remains unpaid, such interest shall be payable on demand from funds on deposit in the Funding Account or the Collection Account, or from proceeds of the Collateral, at the election of the Lender, or as otherwise directed by the Orders.

SECTION 2.05   Facility Fee.   Borrower shall pay to the Lender a facility fee in an amount equal to 1.00% of the aggregate principal amount of the Loans funded hereunder from time to time, which fee shall be fully earned and non-refundable on each date a Loan is funded hereunder and payable in full on the Termination Date.

SECTION 2.06   Payments and Computations.   (a) All payments required to be made by the Borrower pursuant to the Loan Documents shall be paid in full, irrespective of any right of counterclaim or set-off, on the day when due not later than 11:00 A.M. (New York City time) in U.S. dollars to the Lender in same day funds, with payments being received by the Lender after such time being deemed to have been received on the next succeeding Business Day.

(b)     All computations of interest shall be made by the Lender on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest, fees or commissions are payable. Each determination by the Lender of an interest rate, fee or commission hereunder shall be conclusive and binding on the Borrower for all purposes, absent manifest error.

(c)     Whenever any payment under the Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

(d)     If the Lender receives funds for application to the payment of any Obligations under circumstances in which the Loan Documents do not specify the Obligations to which, or the manner in which, such funds should be applied, the Lender shall apply such funds in such order, manner and priority as determined in its sole and absolute discretion.

SECTION 2.07   Increased Costs and Capital Adequacy.   (a) If, due to either (i) the introduction of or any change (including, without limitation, any change by way of imposition or increase of reserve requirements) in, or in the interpretation, administration or application of, any law or regulation (including, without limitation, any law or regulation resulting in any interest

payments paid to the Lender under this Agreement being subject to United States withholding tax) or any guideline of any accounting board or authority (whether or not part of government) which is responsible for the establishment or interpretation of national or international accounting principles, in each case whether foreign or domestic, or (ii) the compliance with any guideline or request from any central bank or other governmental authority (whether or not having the force of law), there shall be any increase in the cost to the Lender or any Affiliate, successor or assign thereof (each of which shall be an "Affected Party") of agreeing to make or making, funding or maintaining any Loan (or any reduction of the amount of any payment (whether of principal, interest, fee, compensation or otherwise) to any Affected Party hereunder), as the case may be, the Borrower shall, from time to time, after written demand by the Affected Party, pay to such Affected Party, additional amounts sufficient to compensate such Affected Party for such increased costs or reduced payments. For the avoidance of doubt, Financial Accounting Standards Board Interpretation No. 46 or any other interpretation of Accounting Research Bulletin No. 51 by the Financial Accounting Standards Board shall constitute a change in the interpretation, administration or application of law, regulation or guideline subject to this Section 2.07.

(b)      If either (i) the introduction of or any change in or in the interpretation, administration or application of any law, guideline, rule or regulation, directive or request of or (ii) the compliance by any Affected Party with any law, guideline, rule, regulation, directive or request from, any central bank, any governmental authority or agency or any accounting board or authority (whether or not part of government) which is responsible for the establishment or interpretation of national or international accounting principle, in each case whether foreign or domestic (whether or not having the force of law), including, without limitation, compliance by an Affected Party with any request or directive regarding capital adequacy, has or would have the effect of reducing the rate of return on the capital of any Affected Party as consequence of its obligations hereunder, under any Loan Document or any related document or arising in connection herewith or therewith to a level below that which any such Affected Party could have achieved but for such introduction, change or compliance (taking into consideration the policies of such Affected Party with respect to capital adequacy), then, from time to time, after demand by such Affected Party (which demand shall be accompanied by statement setting forth the basis of such demand), the Borrower shall pay such Affected Party such additional amounts as will compensate such Affected Party for such reduction. For the avoidance of doubt Financial Accounting Standards Board Interpretation No. 46 or any other interpretation of Accounting Research Bulletin No. 51 by the Financial Accounting Standards Board shall constitute a change in the interpretation, administration or application of law, guideline, rule or regulation, directive or request subject to this Section 2.07.

(c)      Any amounts subject to the provisions of this Section 2.07 shall be paid by the Borrower to the Affected Party within five (5) Business Days following written demand therefor. In determining any amount provided for in this Section 2.07, the Affected Party may use any reasonable averaging and attribution methods. The Affected Party making a claim under this Section 2.07 shall submit to the Borrower a certificate setting forth the basis for and the computations of such reduced payments or additional or increased costs, which certificate shall be conclusive absent demonstrable error.

SECTION 2.08      Inability to Determine Interest Rate; Illegality.   If at any time:

(a)      the Lender determines (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the LIBO Rate, or

11

(b)      the Lender determines that the LIBO Rate will not adequately and fairly reflect the cost to the Lender (as conclusively certified by the Lender) of making or maintaining its Loans,

(c)      the adoption of or any change in any Requirement of Law or in the interpretation or application thereof shall make it unlawful for the Lender to make or maintain LIBOR Loans as contemplated by this Agreement,

the Lender shall give telecopy, email or telephonic notice thereof to the Borrower as soon as practicable thereafter.  If such notice is given (x) any LIBOR Loans requested to be made after such date shall be made as Base Rate Loans and (y) any outstanding LIBOR Loans shall be converted into Base Rate Loans.   Until such notice has been withdrawn by the Lender, no further LIBOR Loans shall be made or continued as such.

SECTION 2.09   Use of Proceeds.  The proceeds of the Loans shall be used solely for the purposes set forth in the Orders, and in each case in accordance with the Budget, or as otherwise agreed by the Lender and shall not on any account be used to fund any investigation of, challenge to, or litigation with respect to the amount, validity or enforceability of any Obligation hereunder, or any Lien or priority granted with respect hereto.

SECTION 2.10   No Discharge; Survival of Claims.  The obligations of the Borrower under the Loan Documents shall not be discharged by the entry of a Confirmation Order (and pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Borrower hereby waives any such discharge) and the entry of a Confirmation Order shall not in any manner affect the nature, priority and extent of the Super-Priority Claims granted to the Lender pursuant to the Loan Documents and/or the Order.  The obligations of the Borrower under the Loan Documents shall survive the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code and the dismissal of the Case, and any such conversion or dismissal of the Case shall not in any manner affect the nature, priority and extent of the Super-Priority Claims granted to the Lender pursuant to the Loan Documents and/or the Orders.

SECTION 2.11   Priority and Liens.  Upon entry of the Interim Order, the Obligations hereunder and under the Loan Documents: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed administrative expense claims in the Case having priority over all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a perfected first priority Lien on all unencumbered pre- and post-petition property of the Borrower and the Guarantor (subject to the entry of the Final Order, including any Bankruptcy Causes of Action, together with the proceeds of such causes of action); (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, shall at all times be secured by valid, binding, continuing, enforceable, fully-perfected security interests in and liens upon the Postpetition Collateral (other than the property that is subject to the existing liens and security interests that secure obligations under the Prepetition Credit Agreement of the Borrower to the Prepetition Secured Party which shall be primed by the liens to be granted to the Lender with respect to the Loans and the Guaranty) junior solely to the valid, perfected and unavoidable liens and security interests in existence on the Petition Date or to valid and unavoidable liens in existence on the Petition Dates that are perfected subsequent to the Petition Dates as permitted by section 546(b) of the Bankruptcy Code; and (iv) pursuant to Section 364(d)(1) of the Bankruptcy Code, shall at all times be secured by a perfected first priority priming lien on all pre- and post-petition property which is subject to any Lien, including Liens granted to secure the Prepetition Indebtedness, in each case subject only to the Carve-Out.

SECTION 2.12    Payment of Obligations.   Subject to the provisions of Article VI, upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents of the Borrower, the Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

## ARTICLE III
CONDITIONS OF LENDING

SECTION 3.01    Conditions Precedent to Each Loan.    In the event the Lender determines in its discretion to make a Loan hereunder, the obligation of the Lender to make such Loan shall be further subject to the satisfaction, or waiver by the Lender immediately prior to or concurrently with the making of such Loan, of the following:

(a)    all of the representations and warranties in the Loan Documents being correct in all material respects on and as of such date, before and after giving effect to such Loan and to the application of the proceeds therefrom, as though made on and as of such date other than any such representations or warranties that, by their terms, refer to a specific date other than the applicable Borrowing Date, in which case as of such specific date;

(b)    no event has occurred and is continuing, or would result from such Loan or the application of the proceeds therefrom, that constitutes a Default or an Event of Default;

(c)    the Termination Date has not occurred;

(d)    the Lender shall have received the Budget, or subsequent to the date hereof, an updated Budget if applicable or if requested by the Lender, and all such other information, reports and records regarding the Borrower, the Mortgage Loans, the Mortgaged Properties and the REO Properties that have been reasonably requested by it or the Servicer and all such information, reports and records shall be complete and accurate; such Loan shall be in compliance with the Budget as approved by the Lender;

(e)    the Lender shall have received the Loan Documents duly executed by the Borrower and the Guarantor (as applicable), each in form and substance satisfactory to the Lender;

(f)    A copy of the Interim Order and/or Final Order shall have been delivered to the Lender, and such Orders shall:

(i)    have been entered by the Bankruptcy Court;

(ii)    be in form and substance satisfactory to the Lender;

(ii)    authorize the Loans in the amounts and on terms and conditions satisfactory to the Lender;

(iii)    approve the process for payment by the Borrower of all of the fees and expenses set forth in the Loan Documents;

(iv)    approve the grant of the administrative claims and Liens on the Collateral in favor of the Lender, as provided in and contemplated by <u>Section 2.11</u> and the Collateral Documents with the priorities set forth in <u>Section 2.11</u>; and

(v)    be in full force and effect and shall not have been amended, stayed, vacated, reversed, modified or rescinded in any respect except as consented to by the Lender;

(g)    The Borrower shall have provided the Lender with such documents, certificates and instruments as reasonably requested by the Lender regarding (i) the due authorization, execution and delivery of the Loan Documents (other than the Guarantee); (ii) the satisfaction of the conditions precedent contained therein by the Borrower; (iii) the due authorization of the Loans and other Transactions; and (iv) the Collateral and the Borrower's compliance with the Loan Documents (other than the Guarantee);

(h)    The Guarantor shall have provided the Lender with such documents, certificates and instruments as reasonably requested by the Lender regarding (i) the due authorization, execution and delivery of the Guarantee; (ii) the satisfaction of the conditions precedent contained therein by the Guarantor; and (iii) the Guarantor's compliance with the Guarantee;

(i)    With respect to each Mortgage Loan as to which a Loan is being made, the Lender (or the Custodian on its behalf) shall have received all documents required to be included in the related Mortgage File, duly executed by the related Mortgagor(s) if applicable, each in form and substance satisfactory to the Lender;

(j)    With respect to each Mortgage Loan as to which a Loan is being made, such Mortgage Loan shall not be in default, or such default shall have been waived by the Lender; and

(k)    With respect to each Mortgage Loan as to which a Loan is being made, the Lender shall have received a trust receipt of the Custodian as to its receipt of the documents required to be included in the related Mortgage File.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES**

SECTION 4.01    <u>Representations and Warranties of the Borrower</u>.    The Borrower represents and warrants as of the date of this Agreement and each date on which a Loan is made to the Borrower pursuant to this Agreement as follows:

(a)    <u>Existence and Power</u>.    The Borrower's jurisdiction of organization is correctly set forth in the preamble to this Agreement.   The Borrower is duly organized under the laws of that jurisdiction and no other state or jurisdiction.   The Borrower is validly existing and in good standing under the laws of its state of organization.   The Borrower is duly qualified to do business and is in good standing as a foreign entity, and has and holds all organizational power and all licenses, authorizations, consents and approvals of Governmental Authorities and tax, accounting, regulatory and licensing bodies required to carry on its business in each jurisdiction in which its business is conducted except where the failure to so qualify or so hold could not reasonably be expected to have a Material Adverse Effect.   Each Loan Document has been duly authorized, executed and delivered by the Borrower.   Each Loan Document is the legal,

14

valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms.

(b)   <u>No Conflict</u>.  The execution, delivery and performance by the Borrower of each Loan Document, and the consummation of the Transactions, are within the Borrower's powers, have been duly authorized by all necessary action on its part, and do not contravene or violate (i) any of its organizational documents, (ii) any law, rule or regulation applicable to it, (iii) any restrictions under any agreement, contract or instrument to which it is a party or by which it or any of its property is bound, or except for the Liens created pursuant to the Loan Documents, result in or require the creation or imposition of any Lien upon or with respect to the Collateral or other assets of the Borrower.

(c)   <u>Authority</u>.  The Borrower's authority to enter into this Agreement, and the other Loan Documents to which it is a party, is subject to the entry by the Bankruptcy Court of the Orders on notice to counsel to the Committee, if any, and the United States Trustee and no further notice to or filing with, any Governmental Authority or any other third party is required for (i) the due execution, delivery, recordation, filing or performance by the Borrower of any Loan Document, or for the consummation of the Transactions, (ii) the grant by the Borrower of the Liens to the Lender pursuant to the Loan Documents, (iii) the perfection or maintenance of the Liens created pursuant to the Loan Documents (including the first priority nature of the Liens granted as provided in <u>Section 2.11</u>), or (iv) the exercise by the Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Loan Documents. All applicable waiting periods in connection with the Transactions have expired without any action having been taken by any competent authority restraining, preventing or imposing materially adverse conditions upon the Transactions or the rights of the Borrower freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

(d)   <u>Compliance with Laws</u>.  The Borrower is a Debtor in a chapter 11 case pending in the District of Colorado and remains subject to operating its business within the requirements of the Bankruptcy Code.  The Borrower has timely filed all reports, documents and other materials required to be filed by it under all applicable Requirements of Law with any Governmental Authority, has retained all records and documents required to be retained by it under all applicable Requirements of Law, and is otherwise in compliance with all applicable Requirements of Law in respect of the conduct of its business and the ownership and operation of its properties, except for such Requirements of Law the failure to comply with which, individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect.

(e)   <u>Information</u>.  No representation or warranty made by the Borrower in any Loan Document, nor any of the statements, documents, certificates or other written information furnished or to be furnished to the Lender and/or the Servicer by the Borrower, contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to make the statements contained herein or therein not misleading.  There are no facts, events or circumstances, contingent or accrued, known to the Borrower that have not been disclosed to the Lender that could reasonably be expected to have or result in a Material Adverse Effect.

(f)   <u>Budgets</u>.  All information included by the Servicer in the Budget from time to time with respect to the Mortgage Loans, the Mortgaged Properties and any REO Properties represents and is based upon the Borrower's reasonable best estimate of the future financial

performance of the subject Mortgaged Properties or REO Properties, as applicable, and all expenditures contemplated in the Budget from time to time for a subject Mortgaged Property or REO Property, as applicable, are based upon the Borrower's assessment that such expenditures will maximize net recovery to the Lender with respect to such Mortgaged Property or REO Property, as applicable, and any related Mortgage Loan.

SECTION 4.02     Loan Fundings.  The funding of any Loan hereunder shall constitute a representation and warranty of the Borrower that (i) all of the conditions to such Loan have been satisfied (unless waived in writing by the Lender), and (ii) no Default or Event of Default has occurred and is continuing except as expressly set forth in a written notice from the Borrower to the Lender prior to the making of such Loan.

**ARTICLE V**
**COVENANTS OF THE BORROWER**

SECTION 5.01     Affirmative Covenants.   So long as any Loan is outstanding or any Obligation remains unpaid, the Borrower shall at all times:

(a)     Compliance with Laws; Preservation of Existence.  Comply with all Requirements of Law.

(b)     Preservation of Corporate Existence.  Preserve and maintain its existence, legal structure, legal name, rights (charter and statutory), permits, licenses, approvals, privileges and franchises.

(c)     Inspection and Information Rights.   (i) Permit the Lender, the Servicer and/or any of their respective agents, advisors or representatives, at any time to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, and evaluate and monitor, the Borrower and to discuss the affairs, finances and accounts of the Borrower and/or the Collateral with any of its officers, directors, employees, agents, representatives and advisors.  In addition, the Borrower shall promptly provide the Lender, the Servicer and/or any of their respective agents, advisors or representatives, with all information, reports, agreements and records regarding the Borrower and/or the Collateral as they may reasonably request in the form and manner requested.

(ii)     The Lender and the Servicer, and their respective agents, advisors or representatives, shall be permitted to continuously remain on the premises of the Borrower and/or visit the Borrower from time to time upon reasonable advance notice  The Lender and the Servicer, and their respective agents, advisors or representatives, shall be given reasonable access to all of the officers, directors, and senior employees of the Borrower as and to the extent the Lender or the Servicer reasonably determines necessary or appropriate (and the Borrower understands and agrees that the Lender and/or Servicer may be monitoring, evaluating and working with its officers, employees, agents, representatives and advisors on a daily basis).   The Borrower shall cause all of its officers, senior employees, agents, representatives and advisors to promptly cooperate in good faith with the Lender, the Servicer and their respective agents, advisors or representatives, at all times.

(d)     Keeping of Books.  Keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of the Borrower in accordance with generally accepted accounting principles then in effect.

(e) <u>Documents Evidencing Security Interest of Lender and Prepetition Secured Party</u>. The Borrower shall execute such documents including, without limitation, mortgages, pledges and financing statements as may be reasonably required to provide further evidence of the perfection of the Lender's and the Prepetition Secured Party's security interests and mortgages in the Postpetition Collateral as provided in the Orders, including in connection with the Loans. If the Lender or the Prepetition Secured Party, in their sole discretion, elect to file any financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise to confirm perfection of the Liens, the Borrower shall cooperate with and assist in such process. Upon the request of the Lender, without any further consent of any party, the Borrower shall take, execute, deliver and file such instruments (in each case without representation or warranty of any kind) to enable the Lender and the Prepetition Secured Party to further validate, perfect, preserve and enforce the Liens and any other liens or security interests granted hereunder as applicable.

(f) <u>Budgets</u>. Provide on an ongoing basis such information, materials, documentation, records and other information as is reasonably requested by the Servicer or the Lender from time to time or that the Borrower otherwise deems necessary or desirable (to the extent such information is in the possession of the Borrower or obtainable by it), in order for the Servicer to prepare and the Lender to evaluate and approve updates to the Budget from time to time

(g) <u>Further Assurances</u>. Promptly upon request by the Lender or the Servicer, execute and deliver, or cause to be executed and delivered, to the Lender or the Servicer such documents and agreements, and shall take or cause to be taken such actions, as the Lender or the Servicer may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents.

SECTION 5.02   <u>Negative Covenants</u>. So long as any Loan is outstanding or any other Obligation is payable to the Lender, the Borrower shall not at any time:

(a) <u>Liens</u>. Subject to the Orders and <u>Section 5.02(k)</u>, create, incur, assume or suffer to exist any Lien except Permitted Liens.

(b) <u>Liabilities</u>. (i) Create, incur, assume or suffer to exist any Liability other than: (x) amounts payable to the Lender pursuant to the Loan Documents and (y) Existing Liabilities; or

(ii) Pay any Liability other than (x) amounts payable to the Lender pursuant to the Loan Documents, (y) amounts payable to the Lender or the Prepetition Secured Party in accordance with the Orders or as otherwise approved from time to time by the Bankruptcy Court, or (z) with the prior written consent of the Lender in its sole and absolute discretion.

(c) <u>Mergers; Sales of Assets</u>. Merge or consolidate with or into any other Person or reorganize or restructure or convey, sell, lease, transfer or otherwise dispose of any assets, or grant any option or other right to use, purchase, lease or otherwise acquire any assets, or otherwise allow any Person to acquire the Borrower (whether by stock sale, asset sale or otherwise), or file a motion or support any motion seeking Bankruptcy Court approval of any such transaction without (i) the written consent of the Lender or (ii) provision for repayment of the Obligations in full in cash.

17

(d)     Amendment of Organizational Documents.  Amend its certificate of incorporation, bylaws or other organizational documents without the prior written consent of the Lender granted or withheld in its sole and absolute discretion.

(e)     Accounting Changes.   Make or permit (i) any material change in accounting policies or reporting practices, except as recommended by its independent public accountants or required by generally accepted accounting principles, or (ii) any change in its fiscal year.

(f)     Prepayments of Liabilities.  Except for a prepayment of the Obligations pursuant to Section 2.03, prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any debt or other Liability without the prior written consent of the Lender granted or withheld in its sole and absolute discretion.

(g)     Negative Pledge.  Enter into, assume or suffer to exist any agreement or other arrangement (other than the Loan Documents) (i) permitting the creation or assumption of any Lien upon the Collateral or any other assets of the Borrower, if any, other than in connection with any Existing Liabilities if such agreement or other arrangement was entered into prior to the Petition Date and constituted a valid and perfected Lien on such date or (ii) prohibiting or restricting any transaction contemplated hereby or by the other Loan Documents.

(h)     Limits on Forming Companies; Investments.  Create or invest in, or purchase or otherwise acquire any interest in any Person without the prior written consent of the Lender and the approval of the Bankruptcy Court.  In addition, the Borrower shall not, without the prior written consent of the Lender and the approval of the Bankruptcy Court, purchase, redeem, hold or acquire any equity, debt or other securities of, make or permit to exist any loans or advances to, or make or permit to exist any investment in, any other Person.

(i)     Certain Actions.  Knowingly or intentionally take or permit any action(s), or fail to take any action(s), if such action(s) or failure(s) would or could reasonably be expected to (i) adversely affect any of the Lender's rights in the Collateral, (ii) result in a breach of any of the representations, warranties, covenants or agreements made by the Borrower in the Loan Documents, or (iii) have or result in a Material Adverse Effect.

(j)     Transactions With Affiliates.  Except with prior written consent of the Lender, enter into any transaction with any of its Affiliates.

(k)     Chapter 11 Claims.  At any time incur, create, assume, suffer to exist or permit (i) any Super-Priority Claim other than those granted to or for the benefit of the Lender or the Prepetition Secured Party, or (ii) any other claim or right to payment that is pari passu with or senior to the Obligations except as provided in the Order and the Carve-Out.

(l)     Settlement of Claims.  Except as otherwise agreed to by the Lender, without providing the Lender with five (5) Business Days prior written notice, enter into any settlement or compromise of any litigation, claim (including a claim for insurance proceeds) or cause of action to which the Borrower is a party, or file or support any motion seeking Bankruptcy Court approval of any such compromise or settlement.  For purposes of this Section 5.02(l), any waiver or release of any litigation, claim (including a claim for insurance proceeds) or cause of action by or on behalf of the Borrower or any Affiliate thereof shall be considered a compromise or settlement.

(m)     Use of Cash.  Except as otherwise agreed to by the Lender, at any time use or invest cash or other funds for any purpose or in any way (including, without limitation, by making any capital expenditures) other than in accordance with the Budget or to pay Liabilities in accordance with the Carve-Out.

(n)     Employees.  Except as otherwise agreed to by the Lender, (i) increase the compensation of any employee or (ii) enter into an employment, severance or similar agreement with any employee.

SECTION 5.03     Reporting Requirements.  So long as any Obligation shall remain unpaid, the Borrower shall furnish to the Lender, such information, reports and records regarding the Borrower (including, without limitation, any information, reports and records with respect to the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrower) or the Collateral as the Lender may from time to time reasonably request, promptly after each request is made, all of which shall be in form and substance reasonably satisfactory to the requesting party and shall be accurate and complete in all material respects when delivered or given to the Lender and, if any such information becomes inaccurate in any material respect after being delivered to the Lender, the Borrower shall provide the Lender with updated information that is accurate in all material respects.

**ARTICLE VI**
**EVENTS OF DEFAULT**

SECTION 6.01     Events of Default.  If any of the following events (each, an "Event of Default") shall occur and be continuing:

(a)     the Borrower shall fail to pay any Obligation (other than Deferred Interest Payments and Additional Deferred Amounts if and for so long as no Event of Default has otherwise occurred and is continuing) payable to the Lender pursuant to the Loan Documents as and when such amount becomes due and payable, whether at the due date thereof or by acceleration thereof or otherwise; or

(b)     any representation, warranty, certification or statement made (or deemed to be made by the Borrower pursuant to the Loan Documents, including but not limited to Article IV hereof) by the Borrower under, pursuant to or in connection with any Loan Document, or any material statement or representation made in any report, financial statement, certificate or other document furnished by the Borrower to the Lender or the Servicer under, pursuant to or in connection with the Loan Documents, shall prove to have been false or misleading in any material respect when made (or deemed made) or delivered; or

(c)     the Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 2.09, Section 2.11, or Article V; or

(d)     the Borrower shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document or any Order that is to be performed or observed by it if such failure shall remain unremedied for more than ten (10) days; or

(e)     one or more judgments as to any post-petition Liability not covered by insurance shall be rendered against the Borrower since the Petition Date and the enforcement thereof shall not be stayed or vacated; or

(f)      any non-monetary judgment or order shall be rendered against the Borrower with respect to any post-petition event that is reasonably likely to have or result in a Material Adverse Effect, and there shall be any period of ten (10) days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(g)      (i) any material provision of any Loan Document shall for any reason cease to be valid and binding on or enforceable against the Borrower, or the Borrower shall so state or assert, or (ii) any Loan Document shall for any reason cease to create a valid and perfected first priority or second priority (as applicable in accordance with Section 2.11) Lien on and security interest in the Collateral; or

(h)      any of the following occurs:  (i) the Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or the Borrower shall seek the dismissal of the Case; (ii) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed or elected in the Case and the order appointing such trustee, administrator, responsible officer or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof; or (iii) an application shall be filed by the Borrower for the approval of any Super-Priority Claim or other claim or right to payment (other than as provided in Section 2.11 and the Orders) in the Case that is pari passu with or senior to the Obligations, or there shall arise or be granted any such pari passu or senior Super-Priority Claim or other claim or right to payment; or

(i)      (i) from and after the date of entry of the Interim Order or the Final Order, as the case may be, any provision of such Order shall cease to be in full force and effect, or (ii) the Borrower shall fail to comply with the terms of the Interim Order or the Final Order in any material respect, or (iii) the Interim Order or the Final Order shall be amended, supplemented, stayed, reversed, vacated or modified (or the Borrower shall apply for authority to do so) without the written consent of the Lender; or

(j)      the Borrower shall file a motion seeking, or the Bankruptcy Court shall enter, an order approving payment of a prepetition claim other than claims approved by the Lender in writing; or

(k)      the Borrower shall file or otherwise support, whether directly or indirectly, a Plan of Reorganization in the Case that fails to provide for the indefeasible payment in full in cash of all of the Obligations on the Consummation Date; or

(l)      one or more Termination Events shall have occurred;

then, and in any such event and without further order of or application to the Bankruptcy Court, the Lender, may take one or more of the following actions at any time or from time to time, at the same or different times: (a) by notice to the Borrower, declare the Loans, all interest thereon and all other Obligations payable under the Loan Documents to be immediately due and payable, whereupon the Loans, all such interest and all such Obligations shall become and be immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower; and (b) on five (5) business days written notice to the Borrower (with a copy to (i) counsel for each statutory committee appointed in the Case, (ii) the United States Trustee for the District of Colorado, and (iii) counsel to the Borrower, at the addresses set forth on Schedule 7.02 (collectively the "Notice Parties")

exercise any and all remedies under the Loan Documents and under applicable law available to the Lender.

## ARTICLE VII
## MISCELLANEOUS

SECTION 7.01    Amendments.  No amendment or waiver of any provision of any Loan Document, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed (or, in the case of the Collateral Documents, consented to) by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall, unless in writing and signed by the Borrower, (w) increase the Maximum Loan Amount, (x) reduce the principal amount of, or the rate of interest payable on, any Loan payable to the Lender, (y) extend any date for payment, or reduce the amount, of any interest, fees or expenses payable to the Lender under the Loan Documents, or (z) extend the final maturity of the Loans.  In addition, no such amendment, waiver or consent regarding the Loan Documents shall affect any of the rights of the Lender under the Loan Documents without the prior written consent of the Lender.  Delivery by telecopier of an executed counterpart of any amendment or waiver of any provision of this Agreement or any Loan Document or of any other agreement, document or instrument delivered pursuant to, or in connection with, any Loan Document shall be effective as delivery of an original executed counterpart thereof.

SECTION 7.02    Notices. All notices and other communications provided for under this Agreement shall be in writing (including telecopy communication) and mailed, telecopied or delivered: (i) if to the Borrower, to P.O. BOX 630130, Littleton, Colorado 80163, Fax: (303) 362-7812, with a copy to Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Attention: Darrell G. Waas, Esq. and David T. Brennan, Esq.; (ii) if to the Lender, to 1211 Avenue of the Americas, New York, New York 10036, Fax: (212) 789-0035, with a copy to Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022; Attention: Mark Liscio, Esq., and Ana Alfonso, Esq.; (iii) if to the Guarantor, to P.O. BOX 630130, Littleton, Colorado 80163, Fax: (303) 362-7812, with a copy to Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Attention: Darrell G. Waas, Esq. and David T. Brennan, Esq.; and (iv) if to the Notice Parties, to the specified addresses on Schedule 7.02, or, as to the Borrower, at such other address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrower. All such notices and other communications shall, when mailed or telecopied, be effective when deposited in the mails or transmitted by telecopier, respectively, except that notices and communications to the Lender shall not be effective until received by the Lender.

SECTION 7.03    No Waiver; Remedies.  No failure on the part of the Lender to exercise, and no delay in exercising, any right under the Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law or in equity.

SECTION 7.04    Indemnification Costs and Expenses.    (a) The Borrower hereby agrees that, whether or not any of the transactions contemplated by this Agreement or the other Loan Documents are consummated, the Borrower will indemnify, defend and hold harmless (on an after-tax basis) the Lender and the Prepetition Secured Party, and their respective successors and assigns and their respective directors, officers, agents, employees, advisors,

shareholders, attorneys and Affiliates (each, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, deficiencies, obligations, fines, penalties, actions (whether threatened or existing), judgments, suits (whether threatened or existing) or expenses (including, without limitation, reasonable fees and disbursements of counsel, experts, consultants and other professionals) incurred by any of them (collectively, "Indemnified Costs") (except, in the case of each Indemnified Party, to the extent that any Indemnified Cost is determined in a final and non-appealable judgment by a court of competent jurisdiction to have directly resulted from such Indemnified Party's gross negligence or willful misconduct) arising out of or by reason of (i) any litigation, investigation, claim or proceeding related to (A) this Agreement, any other Loan Document or the transactions contemplated hereby or thereby, (B) any actual or proposed use by the Borrower of the proceeds of the Loans, or (C) Lender's entering into this Agreement, the other Loan Documents or any other agreements and documents relating hereto (other than consequential damages and loss of anticipated profits or earnings), including, without limitation, amounts paid in settlement, court costs and the fees and disbursements of counsel incurred in connection with any such litigation, investigation, claim or proceeding, (ii) any remedial or other action taken or required to be taken by the Borrower in connection with compliance by the Borrower, or any of its properties, with any federal, state or local Environmental Laws, and (iii) any pending, threatened or actual action, claim, proceeding or suit by any shareholder or director of the Borrower or any actual or purported violation of the Borrower's Governing Documents or any other agreement or instrument to which the Borrower is a party or by which any of its properties is bound.

(b)     Whether or not the Transactions are consummated, the Borrower agrees to pay on demand the following (collectively, "Reimbursed Expenses") (i) all reasonable fees, costs and expenses incurred by or on behalf of the Lender in connection with the preparation, execution, delivery, administration, modification and amendment of the Loan Documents (including (w) all due diligence, collateral review, syndication, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses, (x) the reasonable fees and expenses of counsel for the Lender and the Prepetition Secured Party with respect to the negotiation and preparation of Loan Documents and the Orders, (y) the reasonable fees and expenses of counsel to the Lender and the Prepetition Secured Party with respect to advising such parties as to their rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents, with respect to negotiations with the Borrower or with other creditors of the Borrower arising out of any Default, Event of Default or any events or circumstances that may give rise to a Default or Event of Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto and in respect to protecting and enforcing the Lender's and the Prepetition Secured Party's rights, and (z) the reasonable fees and expenses of such accounting firm or other financial advisors as the Lender or the Prepetition Secured Party may engage to advise it in respect of the Loans from time to time), (ii) all reasonable out-of-pocket costs and expenses of the Lender and the Prepetition Secured Party in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including the reasonable fees and expenses of counsel for the Borrower with respect thereto), (iii) all fees, costs, expenses, indemnities and reimbursements due and owing to the (x) Servicer under the Servicing Agreement and (y) the Custodian under the Prepetition Credit Agreement and the Custodial Agreement, and (iv) all transfer, stamp, documentary or similar taxes, assessments or charges levied by any Governmental Authority in respect of this Agreement or any of the other Loan Documents or any other document referred to herein or therein and all costs, expenses, taxes, assessments and other charges incurred in connection with any filing, registration,

recording or perfection of any security interest contemplated by any of the Loan Documents or any other document referred to herein or therein.

(c)     Any Indemnified Costs and/or Reimbursed Expenses (including fees and expenses of counsel) as to which demand for payment has been made or which are otherwise payable in accordance with any Loan Document, not so paid on demand or when due (collectively, "Additional Deferred Amounts"), shall be payable on the Termination Date or on demand in accordance with this Agreement, and shall bear and accrue interest, from the date each such amount shall be due until such amount shall be paid in full, at the rate per annum set forth in Section 2.04(a) and (b).

(d)     Without prejudice to the survival of any other agreement of the Borrower under any Loan Document, the agreements and obligations of the Borrower contained in this Section 7.04 shall survive the payment in full of principal, interest and all other Obligations payable under the Loan Documents.

SECTION 7.05     Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the Borrower, the Lender and their respective successors and assigns.  The Borrower may not assign or transfer (whether consensually, non-consensually, by operation of law or otherwise) any of its rights or obligations under the Loan Documents without the consent of the Lender.

SECTION 7.06     Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties to this Agreement in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

SECTION 7.07     Confidentiality.  Lender shall not disclose any Confidential Information to any Person without the consent of the Borrower, other than (a) the Lender's Affiliates and to its and their officers, directors, employees, agents and advisors, and then only on a confidential basis in connection with the Lender's performance of its duties or exercise of its rights in connection with the Loans or under the Loan Documents, (b) in connection with an actual or prospective assignment for participation in the Loans, (c) as required by any law, rule or regulation or judicial process, (d) as requested or required by any state, federal or foreign authority or examiner regulating the Lender, and (e) to any rating agency when required by it; provided that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Confidential Information relating to the Borrower received by it from the Lender substantially in accordance with this Section 7.07.

SECTION 7.08     Governing Law.  This Agreement and the other Loan Documents shall be governed by, and construed in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code.

SECTION 7.09     WAIVER OF JURY TRIAL.  EACH OF THE BORROWER AND THE LENDER IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS, THE LOANS, THE COLLATERAL OR THE TRANSACTIONS OR THE ACTIONS OF THE LENDER

IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

SECTION 7.10    <u>Severability</u>.    In case any provision in or obligation under this Agreement or any other Loan Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER:**

                                        **CCI FUNDING I, LLC,**
as Borrower


By:_____
    Name:
    Title:

**LENDER:**

                                          **WESTLB AG, NEW YORK BRANCH,** as Lender


By:_____
    Name:
    Title:


**Acknowledged and agreed to as of the date first above written:**


**COMMERCIAL CAPITAL, INC.**
**as Guarantor**


By: _____
Name : _____
Title: _____

**EXHIBIT A**

**FORM OF GUARANTEE**

**[TO BE PROVIDED]**

## SCHEDULE 7.02

## NOTICES

Office of the United States Trustee
999 18th Street, Suite 1551
Denver, Colorado 80202
Attn: Alan K. Motes, Esq.
Phone: (303) 312-7999
Fax: (303) 312-7259
Email: Alan.Motes@usdoj.gov

Counsel to the Borrower:

Weinman & Associates, PC
730 17th Street, Suite 240
Denver, Colorado 80202
Attn: Jeffrey A. Weinman, Esq.
Phone: (303) 572-1010
Fax: (303)572-1011
Email: jweinman@epitrustee.com

Laufer and Padjen, LLC
5290 DTC Parkway, Suite 150
Englewood, Colorado 80111
Attn: Joel Laufer, Esq.
Phone: (303) 830-3172
Fax: (303) 830-3135
Email: jl@jlrplaw.com

Otten, Johnson, Robinson, Neff & Ragonetti, P.C.
950 17th Street, Suite 1600
Denver, Colorado 80202
Attn: Darrell G. Waas, Esq.
Phone: (303) 825-8400
Fax: (303) 825-6525
Email: waas@ottenjohnson.com

Counsel to the Lender:

Kaye Scholer LLP
425 Park Avenue
New York, New York 10022
Attention: Mark F. Liscio, Esq.
Phone: (212) 836-7550
Fax: (212) 836-6545
Email: mliscio@kayescholer.com